DIN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

LAMAR ANDERSON,

      Plaintiff,

v.

MOHAMMED SIDDIQUI, et al.,

      Defendants.

Case No. 22-CV-00221-SPM

## MEMORANDUM AND ORDER

**McGLYNN, District Judge:**

Pending before the Court are two Motions for Summary Judgment—one filed by Defendants Mohammed Siddiqui, M.D.; Reynal Caldwell, M.D.; and Michael Moldenhauer, N.P. (Doc. 62), and the other filed by Defendants Angela Crain and Amy Lang (Doc. 56). Having been fully informed of the issues presented, both Motions for Summary Judgment are **GRANTED**.

### RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

*Pro se* Planintiff Lamar Anderson, an inmate currently incarcerated at Western Illinois Correctional Center, filed this action on January 26, 2022. (*See* Doc. 1; Doc. 56, p. 1). He brings multiple Eighth Amendment claims pursuant to 42 U.S.C. § 1983 alleging inadequate treatment of his eczema while incarcerated at Menard Correctional Center ("Menard"). (Docs. 1, 8). Following preliminary review under 28 U.S.C. § 1915A, the Court consolidated Anderson's claims into a single Eighth Amendment deliberate indifference claim against Defendants Siddiqui, Caldwell,

Moldenhauer, Crain, and Lang for failing to provide adequate treatment for his eczema. (Doc. 8, p. 3).

According to the operative Complaint, Anderson developed eczema while incarcerated at Stateville Correctional Center. (Doc. 1, p. 3). After he was transferred to Menard Correctional Center, he began to experience difficulties obtaining the medications previously prescribed for his condition. (*Id.*, pp. 3–5). He submitted multiple grievances during his time at Menard regarding the adequacy of his medical treatment for his eczema. (*See id.*, Exs. A, B, C, E). Although Anderson eventually received prescriptions for Benadryl and a topical ointment, he alleges that refills were not consistently provided in a timely manner and that follow-up care was delayed. (*Id.*, pp. 3–5). Anderson's interactions with Defendants regarding the treatment of his skin condition form the basis of his deliberate indifference claim.

Defendants filed two Motions for Summary Judgment on November 13, 2023, one filed by Caldwell and Siddiqui and one by Lang and Crain. (Doc. 34, 37). Both Motions argued that Anderson had not properly exhausted his administrative remedies as is required by Prison Litigation Reform Act, 42 U.S.C. § 1997 *et seq.* ("PLRA"). (*See* Docs. 34, 37). The Court denied both Motions on August 21, 2024. (Doc. 49).

Defendants Crain and Lang then filed the present Motion for Summary Judgment on July 23, 2025 and Siddiqui, Caldwell, and Moldenhauer filed their own Motion for Summary Judgment three months later. (Docs. 56, 62). Anderson responded in opposition to both Motions. (Docs. 58, 74). Only Siddiqui, Caldwell, and

Moldenhauer submitted a Reply. (Docs. 75). Accordingly, both Motions for Summary Judgment are ripe for review.

## APPLICABLE LAW AND LEGAL STANDARDS

The Court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Spurling v. C & M Fine Pack, Inc.*, 739 F.3d 1055, 1060 (7th Cir. 2014) (quoting FED. R. CIV. P. 56(a)). Once the moving party has set forth the basis for summary judgment, the burden then shifts to the nonmoving party who must go beyond mere allegations and offer specific facts showing that there is a genuine issue of fact for trial. FED. R. CIV. P. 56(e); s*ee Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Stated another way, the nonmoving party must offer more than "[c]onclusory allegations, unsupported by specific facts," to establish a genuine issue of material fact. *Payne v. Pauley*, 337 F.3d 767, 773 (7th Cir. 2003) *(*citing *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888 (1990)).

In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.,* 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "A genuine issue of material fact arises only if sufficient evidence favoring the nonmoving party exists to permit a jury to return a verdict for that party." *Faas v. Sears, Roebuck & Co.*, 532 F.3d 633, 640–41 (7th Cir. 2008) (quoting *Springer v. Durflinger*, 518 F.3d 479, 483 (7th Cir. 2008)). The non-movant cannot simply rely on its pleadings; the non-movant must present

admissible evidence that sufficiently shows the existence of each element of its case on which it will bear the burden of proof at trial. *Midwest Imports., Ltd. v. Coval*, 71 F.3d 1311, 1317 (7th Cir. 1995) (citing *Serfecz v. Jewel Food Stores*, 67 F.3d 591, 596 (7th Cir. 1995); *Greater Rockford Energy & Tech. Corp. v. Shell Oil Co.*, 998 F.2d 391, 394 (7th Cir. 1993), *cert. denied*, 510 U.S. 1111 (1994); *Celotex*, 477 U.S. at 323–24).

## ANALYSIS

The Eighth Amendment's prohibition against cruel and unusual punishment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency." *Estelle v. Gamble*, 429 U.S. 97, 102 (1976). Such prohibition requires that the government provide "medical care for those whom it is punishing by incarceration" and safeguards the prisoner against a lack of medical care that "may result in pain and suffering which no one suggests would serve any penological purpose." *Id*. at 103. Accordingly, deliberate indifference to the "serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution." *Rodriguez v. Plymouth Ambulance Serv.*, 577 F.3d 816, 828 (7th Cir. 2009). However, a prisoner is entitled to "reasonable measures to meet a substantial risk of serious harm"—not to demand specific care. *Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997).

Claims for deliberate indifference have an objective and a subjective component. *Gutierrez v. Peters*, 111 F.3d 1364 (7th Cir. 1997). Thus, a plaintiff must establish that he suffered from an objectively and sufficiently serious medical condition and that the defendants actually knew of, but disregarded, a substantial

risk to his health. *Cesal v. Moats,* 851 F.3d 714, 721 (7th Cir. 2017). "Intentional delays in medical care may constitute deliberate indifference, even if the inmate's medical condition is non-life threatening." *Id.* at 722 (quoting *Arnett v. Webster*, 658 F.3d 742, 753 (7th Cir. 2011)). "A doctor's choice of 'easier and less efficacious treatment' for an objectively serious medical condition also may be sufficient but 'mere disagreement with a doctor's medical judgment' is not enough to support an Eighth Amendment violation." *Id.* (first quoting *Estelle*, 429 U.S. at 104 n.10 then quoting *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010)) (citation modified).

Additionally, it is well-settled that mere negligence is not enough to establish a defendant's deliberate indifference. *See, e.g.*, *Davidson v. Cannon*, 474 U.S. 344, 347–48 (1986). In fact, even gross negligence is insufficient. *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012). Instead, deliberate indifference is comparable to criminal recklessness. *Thomas v. Blackard,* 2 F.4th 716 (7th Cir. 2021) (citing *King*, 680 F.3d at 1018). In the context of a deliberate indifference claim, "reckless describes conduct so dangerous that the deliberate nature of the defendant's actions can be inferred." *Jackson v. Illinois Medi-Car, Inc.*, 300 F.3d 760, 765 (7th Cir. 2002) (citation modified).

Meeting the subjective prong is more difficult in cases alleging inadequate care. Without more, a "mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources*, Inc., 839 F.3d 658, 662 (7th Cir. 2016). The Seventh Circuit has explained:

> By definition a treatment decision that's based on professional judgment cannot evince deliberate indifference because professional judgment

> implies a choice of what the defendant believed to be the best course of
> treatment. A doctor who claims to have exercised professional judgment
> is effectively asserting that he lacked a sufficiently culpable mental
> state, and if no reasonable jury could discredit that claim, the doctor is
> entitled to summary judgment.

*Id.* (citing *Zaya v. Sood,* 836 F.3d 800, 805–06 (7th Cir. 2016)). This is in contrast to a case "where evidence exists that the defendant knew better than to make the medical decision that he did." *Id.* (quoting *Petties v. Carter*, 836 F.3d 722, 731 (7th Cir. 2016)) (citation modified). A medical professional's choice of an "easier and less efficacious treatment" can rise to the level of violating the Eighth Amendment only where the treatment is known to be ineffective but is chosen anyway. *Berry,* 604 F.3d at 441 (quoting *Estelle*, 429 U.S. at 104 n.10). The Seventh Circuit has "characterized the standard as imposing a high hurdle on plaintiffs because it requires a 'showing as something approaching a total unconcern for the prisoner's welfare in the face of serious risks.'" *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012) (quoting *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006)).

The first question before the Court is whether Anderson's eczema qualified as a "serious" medical condition. For the purposes of an Eighth Amendment deliberate indifference claim, a serious medical condition is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Wynn v. Southward*, 251 F.3d 588, 593 (7th Cir. 2001) (quoting *Gutierrez*, 111 F.3d at 1373). The Supreme Court has noted that medical conditions far less critical than "life-threatening" are sufficiently serious. *Estelle*, 429 U.S. at 107. In applying this principle, the Seventh

Circuit has held that an infected pilonidal cyst, minor lacerations, bruises, and irritated eyes, and rheumatoid arthritis are all, independently, sufficiently serious. *See Gutierrez*, 111 F.3d at 1370; *Cooper v. Casey*, 97 F.3d 914, 917–18 (7th Cir. 1996); *Arnett*, 658 F.3d at 750. However, the Seventh Circuit put common colds, toes with removed toenails, and mild asthma as being outside the ambit of "serious" medical needs. *See Gutierrez*, 111 F.3d at 1372 (citing *Gibson v. McEvers*, 631 F.2d 95 (7th Cir. 1980); *Snipes v. DeTella*, 95 F.3d 586, 591 n.1 (7th Cir. 1996), *cert. denied*, 519 U.S. 1126 (1997); *Oliver v. Deen*, 77 F.3d 156 (7th Cir. 1996)).

While the Seventh Circuit has not specifically addressed whether eczema is a serious medical condition, this Court has previously held on multiple occasions that painful rashes requiring "multiple creams, steroids, and antihistamines" were "objectively serious." *See Boclair v. Wills,* No. 21-CV-00289-SPM, 2024 WL 3673136, at *8 (S.D. Ill. Aug. 6, 2024) (citing *Parada v. Wexford Health Sources, Inc.*, No. 19-CV-00056-SPM, 2023 WL 3918957, at *4 (S.D. Ill. June 9, 2023)); *see also Franklin v. Gladson,* No. 14-CV-1102-JPG-RJD, 2018 WL 481882, at *3 (S.D. Ill. Jan. 2, 2018) (finding scabies to be objectively serious, particularly given it was treated with a prescription ointment.). Here, the record shows that Anderson's eczema was treated with multiple antihistamines and topical steroids over several years, including Benadryl, Allegra, Zyrtec, Fluocinonide, and various steroid creams. (*See* Doc. 56, Ex. A, 19:4–20:17; *id.*, Exs. F, H, I, T,; Ex. U; Ex. W; Ex. X; Doc. 63, Ex. E, pp. 366, 448, 450; Doc. 56, Ex. A, 35:20–36:12; Ex. H; Ex. K; Ex. M; Ex. O; Ex. R; Ex. W; Ex. X).

In his deposition, Anderson claimed that his condition involves two different kinds of flare-ups on his skin: one in which it feels as though something is "coming out of [his] skin" and the other in which he has dry rashes on different parts of his body. (Doc. 56, Ex. A, 21:6–13). He stated that the Benadryl and topical steroids were effective in managing his skin condition. (*Id.*, Ex. A, 20:21–21:2, 59:1–3, 66:17–19). Based on this record, the Court concludes that Anderson's eczema constituted a sufficiently serious medical need under the first prong of the deliberate indifference standard. *See Cesal,* 851 F.3d at 721.

The Court next turns to the question of whether each of the medical provider Defendants were deliberately indifferent to Anderson's eczema. Since Anderson's Complaint broadly accuses the Defendants of deliberate indifference toward his skin condition, to assess potential liability, the Court must evaluate the undisputed conduct of each Defendant individually.

## I. Defendant Siddiqui

Dr. Mohammed Siddiqui served as Medical Director at Menard from June 12, 2017 through August 2021. (Doc. 63, Ex. B, ¶ 2). Anderson's allegations against him span from April 17, 2017, to July 28, 2021. (*Id.*, Ex. A, 98:6–16). During that period, Dr. Siddiqui evaluated Anderson on multiple occasions, including several visits specifically addressing his eczema and associated itching.

When Anderson transferred to Menard in December 2016, he had an active prescription for Benadryl that expired shortly thereafter. (*See id.*, Ex. E, pp. 2, 4–6, 9–10). On April 17, 2017, Dr. Siddiqui first evaluated Anderson for complaints related

to eczema. (*Id.*, Ex. E, p. 14). Anderson reported that Benadryl was the only medication that relieved his itching and that he had been taking it for approximately two years. (*Id.*). Dr. Siddiqui renewed the prescription, ordering Benadryl 25 mg twice daily for three months. (*Id.*, Ex. E, pp. 14, 126).

On November 20, 2017, Anderson again visited Dr. Siddiqui with complaints related to his chronic eczema. (Doc. 63, Ex. E, pp. 25, 139). Dr. Siddiqui observed lesions on Anderson's torso to be consistent with lichen planus and prescribed Benadryl 25 mg twice daily for six months, along with a topical steroid (triamcinolone 0.1% cream) to be used as needed. (*Id.*). Anderson returned to Dr. Siddiqui on May 14, 2018 and reported persistent itchiness; Dr. Siddiqui observed eczematous lesions on his torso. (*Id.*, Ex. B, ¶ 26). The two discussed continuing Benadryl and triamcinolone, and Dr. Siddiqui prescribed both medications for one year. (*Id.,* Ex. E, pp. 46, 151).

On August 22, 2018, Dr. Siddiqui evaluated Anderson primarily for elevated blood pressure. (*Id.*, Ex. E, pp. 48, 154). Because of Anderson's hypertension, Dr. Siddiqui initiated Lopressor (metoprolol), a medication used to treat high blood pressure, and discontinued Benadryl. (*Id.*). According to Dr. Siddiqui, Benadryl can interfere with Lopressor's metabolism and increase the risk of adverse effects. (*Id.*, Ex. B, ¶ 29). Given Anderson's elevated blood pressure, Dr. Siddiqui elected to trial the antihypertensive medication without Benadryl. (*Id.*). Anderson disagreed with that decision but provided no medical evidence disputing Dr. Siddiqui's rationale. (Doc 74, ¶ 26; Doc. 75, ¶ 26).

On October 31, 2018, Anderson once again returned to Siddiqui with complaints of generalized skin lesions. (*See* Doc. 63, Ex. E, pp. 51, 156). Dr. Siddiqui assessed the lesions as likely lichen planus and noted that Benadryl had been effective for itching. (*Id.*). Because Anderson's blood pressure was normal, and he appeared to not be experiencing adverse effects from Lopressor, Siddiqui re-prescribed Benadryl and referred Anderson for consideration of a skin biopsy. (*Id.*, Ex. E, pp. 51, 156; Ex. B, ¶¶ 29, 30).

On May 28, 2019, Dr. Siddiqui documented that Anderson's eczema had improved with steroid treatment and renewed triamcinolone. (*Id.,* Ex. E, p. 63). On July 22, 2019, Anderson again sought Benadryl for treatment for eczema. (*Id.*, Ex. E, pp. 66, 168; Ex. B, ¶ 37). The medical note reflects that he reported improvement in itching while on Benadryl and Dr. Siddiqui prescribed Benadryl 25 mg twice daily for three months. (*Id.,* Ex. E, pp. 66, 168). During a November 27, 2019, chronic clinic visit, Dr. Siddiqui noted Anderson's history of eczema and generalized lichenoid lesions, renewed Benadryl and triamcinolone and again referred Anderson for a biopsy. (*Id.,* Ex. E, pp. 111–12, 176).

Later visits in 2020 and 2021 primarily addressed hypertension management, abnormal laboratory results, headaches, and an evaluation of a longstanding scalp lesion. (*Id.*, Ex. E, pp. 92, 100–01, 117–18, 196, 212, 214, 307). The record reflects that eczema was not discussed at those visits. (*Id.,* Ex. B, ¶¶ 42, 44, 47). Dr. Siddiqui's final documented encounter with Anderson occurred on July 28, 2021, shortly before he left his position at Menard. (*Id.*, Ex. E, p. 307; *id.*, Ex. B, ¶ 48).

In sum, the record shows that Dr. Siddiqui repeatedly evaluated Anderson for eczema and related itching, prescribed medications including Benadryl, and renewed those prescriptions on a regular basis. Although he temporarily discontinued Benadryl due to concerns about a potential interaction with an antihypertensive medication, he reinitiated the medication once Anderson's blood pressure stabilized. Additionally, Dr. Siddiqui referred Anderson for further dermatologic evaluation on multiple occasions.

Anderson asserts that Dr. Siddiqui deprived him of the Benadryl necessary to treat his eczema. In his deposition, Anderson identified only one instance—between August 22, 2018, and October 31, 2018—when Dr. Siddiqui discontinued the medication. (*See id.*, Ex. A, 105–06; *id.*, Ex. E, pp. 48, 51). As discussed *supra*, Dr. Siddiqui made this decision due to concerns about Anderson's elevated blood pressure and elected to discontinue Benadryl because of a potential interaction with Lopressor. While Anderson disagreed with the decision, believing it unrelated to his condition, the record reflects that Dr. Siddiqui's determination was grounded in medical judgment, as he believed Benadryl could interfere with Lopressor's effectiveness and increase the risk of adverse effects. (*Id.*, Ex. B, ¶ 29).

The Seventh Circuit has stated that "[o]ne thing which has long been clear in our Eighth Amendment cases is that the amendment is not coterminous with a medical malpractice claim." *Forbes*, 112 F.3d at 266 (citing *Bryant v. Madigan*, 84 F.3d 246 (7th Cir. 1996); *Oliver*, 77 F.3d 156; *Snipes*, 95 F.3d 586). Additionally, prisoners are "not entitled to the best care possible" but rather "to reasonable

Page 11 of 26

measures to meet a substantial risk of serious harm." *Id.* at 267. When a prisoner sought "specific treatment and foolproof protection from infection," the Seventh Circuit stated that "the Eighth Amendment does not provide her with either." *Id.* at 266 (citation modified).

Here, Siddiqui's decision was made in a context where he was aware of Anderson's prior use of Benadryl to treat his symptoms. Although Dr. Siddiqui did not yet know whether other treatments like topical steroids would be effective, he instructed Anderson to return if his symptoms worsened, and he adjusted treatment accordingly when they did. (*Id.,* Ex. A, 49:9–16; *id.*, Ex. B, ¶ 29; *id.,* Ex. E, p. 63). Anderson also conceded that no medical professional had told him his condition worsened due to treatment provided by Dr. Siddiqui. (*Id.*, Ex. A, 99:23–100:2). "In the Eighth Amendment context, medical professionals receive a great deal of deference in their treatment decisions." *Wilson v. Wexford Health Sources, Inc.,* 932 F.3d 513, 519 (7th Cir. 2019). There is only a Constitutional violation if "no minimally competent professional would have so responded under those circumstances." *Id.* (citing *Collignon v. Milwaukee County,* 163 F.3d 982, 989 (7th Cir. 1997)).

Based on the record, the Court concludes that Dr. Siddiqui's decisions reflected medical judgment rather than deliberate indifference. When Siddiqui temporarily discontinued Benadryl, he advised Anderson to return if his condition worsened, and when it did, Siddiqui corrected course. *See Arnett,* 658 F.3d at 754 ("[a] prison physician cannot simply continue with a course of treatment that he knows is ineffective in treating the inmate's condition."). Therefore, even when construing the

evidence in Anderson's favor, no reasonable jury could find that Dr. Siddiqui acted with deliberate indifference, meaning that summary judgment shall be granted for Dr. Siddiqui.

## II.   Defendant Caldwell

The Court now evaluates the undisputed evidence concerning Dr. Reynal Caldwell and his role in Anderson's medical treatment. Dr. Caldwell was employed by Wexford Health Sources as a Traveling Medical Director from May 18, 2015, through August 8, 2024. (Doc. 63, Ex. C, ¶ 2). Between 2018 and 2020, he provided medical services at various correctional facilities in Southern Illinois on an as-needed basis including Menard. (*Id.*). Anderson testified that his claims against Dr. Caldwell relate to the period from December 21, 2018, through February 11, 2020, in which he visited Dr. Caldwell four times. (*Id.*, Ex. A, 97:21–98:4).

Dr. Caldwell's first encounter with Anderson occurred on December 21, 2018, during a General Medicine Chronic Clinic visit. (*Id.*, Ex. C, ¶ 28). The purpose of the appointment was to evaluate Anderson for a possible skin biopsy related to his eczema. (*Id.,* Ex. E, pp. 56, 107–08, 159). After examining Anderson's skin, Dr. Caldwell concluded that the presentation was consistent with eczema and that a punch biopsy was not clinically indicated. (*Id.*, Ex. C, ¶ 28). He noted that Anderson's symptoms responded to Benadryl and prescribed Benadryl 25 mg twice daily for six months. (*Id.*, Ex. E, pp. 56, 107–08, 159).

Nearly one year later, Anderson was again referred to Dr. Caldwell for further evaluation, including consideration of a biopsy due to his history of eczema, pruritus,

and generalized lichenoid lesions. (Doc. 63, Ex. E, pp. 111–12, 176). Based on that referral, Dr. Caldwell saw Anderson on December 10, 2019. (*Id.*, Ex. E, pp. 71, 178). At that visit, Dr. Caldwell prescribed Kenalog (triamcinolone), a topical corticosteroid, and Zyrtec, an antihistamine, for a ninety-day period, and instructed Anderson to return in thirty days. (*Id.*). Dr. Caldwell testified that his examination again led him to conclude that a punch biopsy was not medically necessary. (*Id.*, Ex. C, ¶ 37). Anderson requested additional testing because he was frustrated with recurring flare-ups and what he viewed as lapses in follow-up care. (Doc. 74, ¶ 37). Anderson identified no evidence suggesting that a biopsy was required, and Dr. Caldwell continued to maintain that the condition was consistent with eczema and manageable with medication. (Doc. 63, Ex. C, ¶ 37; Doc. 75, ¶ 37). At a follow-up appointment on January 7, 2020, Dr. Caldwell noted that Anderson's rash was controlled with Kenalog, and no new medications or further treatment were ordered. (Doc. 63, Ex. E, p. 73).

On January 29, 2020, Dr. Caldwell evaluated Anderson for an unrelated concern involving a lump on his lip, which was removed two weeks later. (Doc. 63, Ex. E, pp. 77, 79). Anderson's eczema was not addressed during either the evaluation or the removal visit, and Dr. Caldwell testified that this was his final encounter with Anderson. (*Id.*, Ex. C, ¶¶ 39, 40).

In summary, the undisputed evidence shows that Dr. Caldwell saw Anderson on several occasions for eczema-related complaints, assessed his condition as consistent with eczema, prescribed antihistamines and topical steroids, and declined

to perform a biopsy based on his clinical judgment. Accordingly, the Court does not find Caldwell's behavior tantamount to deliberate indifference.

While Anderson's primary criticisms of Dr. Caldwell involved delays in renewing his prescriptions, he acknowledged that those issues couldn't be blamed on Dr. Caldwell. (Doc. 63, Ex. A, 27:5–28:13, 105:5–8). When asked whether he believed Dr. Caldwell had done everything he could to ensure that Anderson's medications would be renewed and provided after they expired, Anderson answered yes. (*Id.*, Ex. A, 55:4–8). Anderson's only remaining criticism was that Dr. Caldwell did not perform a punch biopsy. (Doc. 63, Ex. A, 27:5–13). However, a prisoner's disagreement with a physician's chosen course of treatment, standing alone, does not establish deliberate indifference under the Eighth Amendment. *Snipes*, 95 F.3d at 591. Dr. Caldwell determined through visual examination that Anderson's condition was consistent with eczema and that a punch biopsy was not medically necessary. (Doc. 63, Ex. C, ¶ 28) Accordingly, the Court finds that judgment medically reasonable.

When considering the undisputed facts of this matter in light of circuit precedent, it is clear that Dr. Caldwell's conduct could not be found by a jury to be "something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Rosario*, 670 F.3d at 821 (quoting *Collins*, 462 F.3d at 762). Therefore, summary judgment shall be granted in favor of Defendant Caldwell, as well.

## III.   **Defendant Moldenhauer**

Next, the Court reviews the undisputed evidence concerning Michael Moldenhauer and his role in Anderson's medical treatment. Moldenhauer has been

employed as a Nurse Practitioner by Wexford Health Sources, Inc. since January 15, 2013. (Doc. 63, Ex. D, ¶ 2). While at Menard, Moldenhauer saw Anderson intermittently between March 4, 2018, and December 16, 2022. (*Id.*, Ex. A, 97:11–20).

Moldenhauer's first documented encounter with Anderson occurred on March 4, 2018; Anderson presented with a rash on his torso and reported that he had previously been prescribed Benadryl. (Doc. 63, Ex. E, pp. 41, 148). Moldenhauer noted itching and areas of darkened skin. (*Id.*). Anderson requested a long-term prescription for Benadryl, which had previously been ordered by Dr. Siddiqui. (*Id.*). In response, Moldenhauer prescribed a short three-day course of Benadryl 25 mg twice daily and referred Anderson to Dr. Siddiqui for further evaluation regarding the appropriateness of long-term use. (*Id.*, Ex. D, ¶ 21). Moldenhauer explained that under IDOC policy, Benadryl was generally not prescribed long-term for medical conditions and that extended use was typically limited to psychiatric indications. (*Id.*). He further stated that the short-term prescription was intended to provide interim relief pending physician review. (*Id.*). Moldenhauer explained that once he issued a referral, nursing staff were responsible for placing the patient on the appropriate call line and that he did not control or create provider schedules. (Doc. 63, Ex. D, ¶ 22). Thus, although he initiated the referral, the actual scheduling was handled by other personnel. (*Id.*).

On April 20, 2018, Anderson again presented to Moldenhauer with complaints of dry skin related to his eczema. (*Id.*, Ex. E, p. 45). During that visit, Moldenhauer recorded that he observed no objective signs of dryness or eczema, described the

examination as normal, and noted that Anderson had already been referred to Dr. Siddiqui. (*Id.*). Because he did not observe clinical signs of eczema at that time and a referral was already pending, Moldenhauer did not issue an additional referral or prescribe Benadryl. (Ex. D, ¶ 24).

On September 8, 2021, Anderson next presented to Moldenhauer with complaints of a rash, worsening nighttime itching, and an expired Benadryl prescription. (Doc. 63, Ex. E, pp. 397–98, 418). Moldenhauer recorded that he did not observe a rash on examination. (*Id.*). Nevertheless, in response to Anderson's reported symptoms, he prescribed Benadryl 25 mg once daily for one month and triamcinolone cream. (*Id.*). He also submitted a dermatology referral, noting Anderson's reported history of dermatologic evaluation and his request for renewed medications. (*Id.*, Ex. E, p. 367).

On December 3, 2021, Moldenhauer saw Anderson for renewal of his Benadryl prescription. (Doc. 63, Ex. E, pp. 329, 423). He documented rough, dry skin on Anderson's lower body and noted that a dermatology appointment was expected in January 2022. (*Id.*). He prescribed Benadryl 25 mg for one month and Triamcinolone. (*Id.*). On March 1, 2022, nursing staff recorded verbal orders from Moldenhauer renewing T-Gel shampoo, Kenalog ointment, and Benadryl 25 mg for six months. (*Id.*, Ex. E, pp. 341, 428). Later, on December 16, 2022, after reviewing dermatology notes, Moldenhauer prescribed Allegra, Zyrtec, Benadryl, and fluocinonide solution for one year in accordance with dermatology recommendations. (*Id.*, Ex. E, pp. 366, 448, 450).

These records reflect continued medication management of Anderson's skin complaints, including implementation of specialist recommendations.

The most contentious part of Moldenhauer's care was his visit with Anderson on March 4, 2018, wherein he prescribed Benadryl for only three days. (*Id.*, Ex. E, pp. 41, 148). When asked why he was suing Moldenhauer, Anderson pointed specifically to this interaction, asserting that he disagreed with the short duration of the prescription because it would not remain effective in his system for a sufficient period. (*Id.*, Ex. A, 29:4–20).

The Court first considers that, as stated before, Eighth Amendment deliberate indifference does not apply simply because a patient disagrees with a practitioner's course of treatment. *Snipes,* 95 F.3d at 591. Here, the short-term order of Benadryl was prescribed after Moldenhauer noted that long-term Benadryl was prescribed by Dr. Siddiqui. (*Id.,* Ex. D, ¶ 21). Moldenhauer intended the short-term order to provide temporary relief until Anderson could be reevaluated by Dr. Siddiqui. (*Id.*). He further explained that IDOC policy generally restricted long-term Benadryl prescriptions to psychiatric indications. (*Id.*). In his role as a Nurse Practitioner, Moldenhauer followed that policy while simultaneously referring Anderson back to a physician for further assessment.

However, Anderson did not see Dr. Siddiqui until May 14, nearly two and a half months after Moldenhauer issued the referral. (*Id.*, Ex. D, ¶ 22). Given the gap between the three-day Benadryl order and the eventual long-term prescription by Dr. Siddiqui, the Court considers whether this delay could constitute delayed medical

treatment, which may support a finding of deliberate indifference. *See Berry*, 604 F.3d at 441 ("A significant delay in effective medical treatment also may support a claim of deliberate indifference, especially where the result is prolonged and unnecessary pain."). However, even in cases of delayed treatment, a plaintiff must present evidence that the defendant acted with the requisite bad intent in causing the delay. *Burton v. Downey*, 805 F.3d 776, 785 (7th Cir. 2015). Here, Moldenhauer explained the basis for his decision, including IDOC policy limitations and the need for physician review, and the Court finds no evidence of bad intent. Moreover, Moldenhauer demonstrated that he was not responsible for scheduling his own or other providers' call lines. (Doc. 63, Ex. D, ¶ 22). Considering the circumstances, the Court concludes that Moldenhauer's conduct does not amount to "something approaching a total unconcern for the prisoner's welfare in the face of serious risks," *i.e.*, deliberate indifference. *Rosario*, 670 F.3d at 821 (quoting *Collins*, 462 F.3d at 762).

Viewed as a whole, the undisputed record shows that Moldenhauer evaluated Anderson when he presented with complaints of itching and rash, documented his clinical findings, prescribed medication, and referred him to other practitioners for further assessment. Although Anderson disagreed with the dosing and duration of certain prescriptions, the record reflects ongoing evaluation and treatment rather than a refusal to address his skin condition. Construing the evidence in Anderson's favor, no reasonable jury could conclude that Nurse Practitioner Moldenhauer acted

with deliberate indifference and summary judgment shall be granted in Moldenhauer's favor.

## IV.    Defendants Lang and Crain

Finally, the Court addresses the undisputed evidence concerning Amy Lang and Angela Crain and their respective roles in Anderson's medical care. Because both assert qualified immunity, their conduct is addressed together.

Lang works as a nurse at Menard. (Doc. 1, p. 2). Anderson contends that Lang acted with deliberate indifference by refusing to renew his medications and by preventing him from seeing a doctor. (Doc. 63, Ex. A, 117:1–120:2). However, Anderson acknowledges that Lang lacked authority to prescribe medications and that he ultimately was able to see a physician after submitting several grievances. (*Id.*, 119:22–120:3–11).

Ms. Crain serves as a healthcare unit administrator at Menard. (*Id.*, 114:7–10). Anderson argues that, because she is responsible for ensuring that medical staff perform their duties, she is liable for his inability to obtain timely medication renewals. (*Id.*, 115:20–116:16). Crain responds that "it is the offender's responsibility to monitor the expiration date of his medication orders and submit a written request to NSC for medication renewal," and that on both occasions when Anderson's prescriptions expired, he failed to submit the required written request. (Doc. 56, Exs. B, C).

Lang and Crain move for summary judgment on both deliberate indifference and qualified immunity grounds. The Court addresses each argument in turn.

## A.      Deliberate Indifference

The Court first addresses Anderson's claim that Lang refused to prescribe Anderson his medication. Failure to prescribe medication when an individual does not have the authority to prescribe medication has been consistently rejected as a basis for a deliberate indifference claim. *See, e.g., Patterson v. Wexford Health Care Servs.*, No. 222CV00113JRSMJD, 2024 WL 1012961, at *11 (S.D. Ind. Mar. 8, 2024); *Harlow v. Hamlyn*, No. 3:24-CV-956-HAB-SLC, 2024 WL 5007453, at *3 (N.D. Ind. Dec. 6, 2024); *Thompson v. Conant*, No. 1:12-CV-1177-SEB-TAB, 2013 WL 4543042, at *9 (S.D. Ind. Aug. 26, 2013), *aff'd*, 559 F. App'x 557 (7th Cir. 2014). Because Nurse Lang's ability to prescribe medication was lacking, Lang's failure to prescribe Anderson his medication does not equate to her ignoring Anderson's complaints or requests. Rather, she was simply unable to address them. Accordingly, Nurse Lang did not act with deliberate indifference on this point.

Turning to Anderson's argument that Lang denied his requests to see doctors between 2017 and 2020, the Court concludes this is without merit. Anderson's medical records, discussed in detail throughout this Order, show that he saw doctors regularly during this time. Without evidence of a specific instance where Lang's denial caused a delay in Anderson's medical care, it is difficult to make a case for deliberate indifference. *See Gallo v. Sood,* 651 Fed. App'x 529, 534 (7th Cir. 2016) (holding that a nurse was not found to act with deliberate indifference where plaintiff had not shown that her actions caused a month-long delay resulting in later suffering). Anderson stated in his Deposition that he filed grievances in response to

Lang's denial, but the grievances in question do not mention Lang by name. (*See* Doc. 1, Ex. A; *id.*, Exs. B, C, E). In fact, in the grievance dated March 16, 2018, Anderson stated that "the nurse" put him in to see a doctor and that he did see a doctor. (*Id.*, Ex. B). Accordingly, the Court finds that Nurse Lang did not act with deliberate indifference on this point.

Next, the Court addresses Anderson's claim against Crain, namely, that she was responsible for ensuring that medical staff performed their duties and could be held liable when he failed to receive his medication. (*Id.*, 115:20–116:16). To establish deliberate indifference against a nonmedical prison official, a plaintiff must show more than dissatisfaction with the outcome of medical care; they must show that the administrator knew something was amiss with the acting physician's treatment *See Rasho v. Elyea*, 856 F.3d 469, 478–79. (7th Cir. 2017). The Seventh Circuit has held that prison administrators are generally entitled to rely on the judgment of medical professionals. *Id.* Where an inmate is under the care of qualified medical providers, a nonmedical official may ordinarily assume that the inmate's treatment is being appropriately managed. *See Johnson v. Doughty*, 433 F.3d 1001, 1010–12 (7th Cir. 2006); *Perkins v. Lawson*, 312 F.3d 872, 875–76 (7th Cir. 2002). Thus, a nonmedical official is entitled to summary judgment when she responds reasonably to an inmate's complaint, such as by confirming that the inmate has been evaluated or is scheduled to receive medical attention, even if the inmate disagrees with the medical course ultimately provided. *See Johnson*, 433 F.3d at 1010–12.

The undisputed record shows that Crain's involvement consisted of responding to grievances regarding expired Benadryl prescriptions. On March 3, 2020, she noted that Anderson's prior order had expired on November 21, 2019, and that a new order was issued six days later. (Doc. 56, Ex. B). She further explained that inmates are responsible for monitoring expiration dates and submitting written requests for renewal. (*Id.*). On November 22, 2021, Crain responded to another grievance by confirming that Anderson's Benadryl prescription had expired on October 7, 2021, that no renewal request had been submitted, and that he would be scheduled for medication renewal. (Doc. 56, Ex. C).

Although Anderson contends that she failed to act promptly, the record reflects that she reviewed the medication history and directed him through the established renewal process when necessary. (*Id.*, Ex. B). There is no evidence that Crain prescribed, denied, or interfered with medical treatment, or that she disregarded a known risk to Anderson's health. Rather, her role was limited to administrative oversight and grievance review, and she was entitled to rely on medical staff to determine the appropriate course of treatment. Therefore, the Court finds that when construing the evidence in favor of Anderson, the Court finds that Ms. Crain did not act with deliberate indifference.

### B.    Qualified Immunity

Lang and Crain also argue that they are entitled to qualified immunity. (*See* Doc. 56, pp. 11–12). While the Court need not assess Defendants Lang and Crain's qualified immunity argument due to the fact that Anderson's Eighth Amendment

claims do not survive Lang and Crain's Motion for Summary Judgment, the Court will briefly discuss the applicability of qualified immunity to the instant facts.

Defendants argue that they are entitled to qualified immunity because "[g]overnment officials performing discretionary functions generally are shielded from liability for civil damages if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." (Doc. 56, p. 11 (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). They argue that "to determine whether an official is entitled to qualified immunity, a two-part inquiry is required: (1) whether a constitutional right would have been violated on the facts alleged, and (2) whether the right alleged to have been violated was clearly established." (*Id.* (citing *Saucier v. Katz*, 533 U.S. 194, 200 (2001))). Defendants argue that a constitutional right was not violated because Defendants were not deliberately indifferent toward Anderson's medical needs and that no clearly established right was violated because neither Defendant observed Anderson's rash nor did he suffer any serious injury from intermittent medical delay. (*Id.*, pp. 11–12).

Regarding Anderson's Eighth Amendment claim, the Seventh Circuit has established that "[w]hen considering deliberate-indifference claims challenging the medical judgment of prison healthcare personnel, qualified-immunity analysis requires us to frame the legal question with reasonable specificity." *Campbell v. Kallas*, 936 F.3d 536, 546 (7th Cir. 2019). In *Campbell*, the Seventh Circuit determined that "[t]he proper inquiry is whether then-existing caselaw clearly established a constitutional right to gender-dysphoria treatment beyond hormone

therapy" not "that 'denying effective treatment' for Campbell's medical condition violates the Eighth Amendment" because the latter "formulation—which is basically a highly conceptualized version of the deliberate-indifference standard—is far too general." *Id.* at 546. Additionally, "'[f]or purposes of qualified immunity, [the Eighth-Amendment] duty' to treat prisoners' serious medical conditions 'need not be litigated and then established disease by disease or injury by injury.'" *Id.* at 548 (quoting *Est. of Clark*, 865 F.3d at 553). Moreover, "[w]hen prison officials utterly fail to provide care for a serious medical condition, the constitutional violation is obvious and qualified immunity offers little protection." *Id.* (citing *Orlowski v. Milwaukee County*, 872 F.3d 417, 422 (7th Cir. 2017)).

Here, Defendants' argument succeeds because prison officials did not persist in ineffective treatments. *See id.* at 547 (quoting *Greeno v. Daley*, 414 F.3d 645, 655 (7th Cir. 2005) (citing *Petties*, 836 F.3d at 729–30). It has clearly been established that the Defendants treated Anderson's eczema to the extent necessary in their respective roles. Further, like in *Campbell*, there is no Circuit precedent indicating that the chosen course of care for Anderson's eczema violated a constitutional right, meaning the Defendants were not on notice of a constitutional violation and would be entitled to qualified immunity if the Court reached that question.

## CONCLUSION

For the reasons set forth above, Defendants' Mohammed Siddiqui, Reynal Caldwell, and Michael Moldenhauer's Motion for Summary Judgment (Doc. 62) and Defendants' Amy Lang and Angela Crain's Motion for Summary Judgment (Doc. 56)

are both **GRANTED**. This case is **DISMISSED with prejudice**. The Clerk of Court

is **DIRECTED** to close this case on the Court's docket.

**IT IS SO ORDERED.**

**DATED: March 13, 2026**

                                          **/s/ Stephen P. McGlynn**
                                          **STEPHEN P. McGLYNN**
                                          **U.S. District Judge**